IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division



MARY E. BEASLEY,
*Personal Representative for Estate of Darryl E. Beasley,*

    Plaintiff,

v.                                     Case No. 3:12-cv-00006-JAG

AARON BROWN,
RENEE BROTHERS,
ANTHONY ANDERSON,
KENNETH KEPLEY,
and WANDA HENDERSON,

    Defendants.

## MEMORANDUM OPINION

This matter comes before the Court on the defendants' motion for summary judgment. The plaintiff, Mary E. Beasley, personal representative of the decedent, Darryl E. Beasley ("Beasley"), filed suit against the defendants, all of whom were deputies in the City of Petersburg Sheriff's Office at the time of Beasley's death, for violations of his constitutional rights and Virginia law.

The Court grants the motion for summary judgment. The plaintiff simply has not produced evidence establishing that the defendants violated the decedent's constitutional rights. Moreover, even if a violation occurred, the defendants' actions were not so unreasonable as to place them outside the scope of qualified immunity. With respect to the plaintiff's state law claims for wrongful death and conspiracy, the Court holds that the plaintiff cannot show the defendants violated any duty owed to the decedent or had any intent (or joint intent) to harm him.

For these reasons, the Court grants summary judgment to the defendants on all counts and dismisses the plaintiff's action.

## I. Statement of Facts

On June 19, 2010, Petersburg Police Officers arrested Beasley for possession of a controlled substance with intent to distribute. Following the arrest, these officers took Beasley to the Petersburg City Jail for processing. One of the officers then told Sheriff's Deputy Anthony Anderson ("Anderson") that he suspected Beasley of hiding drugs in his buttocks. After Deputy Aaron Brown ("Brown") completed a pat-down search, Anderson thus advised everyone that they would conduct a strip search as well.

Anderson, Brown, and Captain Kenneth Kepley ("Kepley") then took Beasley to the jail property room for a strip search. Beasley initially followed Anderson's instruction to remove his clothing. Anderson next asked Beasley to turn around, bend over, and spread his buttocks to permit a cavity search. Despite three separate orders and Anderson's pantomiming the movement, Beasley refused to comply. Moments later, Beasley—completely nude—took off running. Anderson saw Beasley reach into his buttocks, remove something, and place it in his mouth. Anderson then cried out, "[H]e's got something in his mouth." Anderson Aff. ¶ 7. Beasley burst through the property room door and ran into a jail hallway, where the deputies quickly caught and subdued him.

The plaintiff says that the deputies pinned Beasley to the floor and used their collective weight to suffocate him. The central problem with the plaintiff's factual theory of the case is that no evidence supports it.

From the moment Beasley burst through the property room door and into the hallway, a jail security camera provided a view (without audio) of Beasley, the deputies, and their

interactions.[1] Within three to four seconds, Brown caught up to Beasley and wrapped his arms around his waist. At this point, the view became partially obscured because the altercation occurred in the extreme foreground, almost directly below the camera's range of view. Nevertheless, one could see the other two deputies, who were following close behind, reach the skirmish and assist Brown in bringing Beasley to the ground.[2]

The next deputy arrived less than twenty seconds later.[3] In the interim, the camera provided an obscured view of Beasley because he was on the hallway floor, with the first three officers positioned between him and the camera. For about ten seconds, however, the officers' collective movement shows that they were trying to restrain Beasley, who recognizably continued to struggle beneath them.[4] During this time, Anderson was clearly kneeling rather than lying on top of Beasley.[5] In fact, after kneeling for about thirty seconds, Anderson came to a position where he was half-standing/half-leaning against the wall, before resuming his kneeling position.[6]

Brown, who was positioned above and slightly behind Beasley, also knelt for approximately the first thirty-five seconds that Beasley was on the ground;[7] after that point, Brown's posture was even more upright, with his legs visibly bent, showing that he was

---

[1] The defendants have created a video-like image based on a continuous series of still photos taken by the camera, which was situated in an upper corner of the hallway. The Court therefore refers to "video" footage throughout the remainder of the opinion. Beasley emerges from the property room at approximately 6:12 of this video. *See* Defs.' Mem. Supp. Mot. for Summ. J., Ex. K.
[2] *Id.* at 6:21 – 6:22.
[3] *Id.* at 6:35 – 6:36.
[4] *Id.* at 6:20 – 6:30.
[5] *Id.* at 6:20 – 6:50.
[6] *Id.* at 6:50 – 7:15.
[7] *Id.* at 6:20 – 6:55.

3

undoubtedly kneeling beside rather than lying on top of Beasley.[8] In Brown's own words, "[w]hile partially kneeling on the back of Beasley's upper thighs, [he] placed [his] hands on the back of Beasley's shoulders to attempt to keep him still, while Anderson commanded Beasley to 'spit it out' and 'open your mouth' repeatedly." Brown Aff. ¶ 9. Anderson claims that he manually "tried to force Beasley's jaw open," but "[i]t appeared that [Beasley] was clenching down harder. He would not open his mouth or spit the item out." Anderson Aff. ¶ 8.

Both Brown and Anderson flatly deny ever being on top of Beasley's torso or chest or putting their full body weight on his torso or chest. Anderson Aff. ¶ 9; Brown Aff. ¶ 10. Nothing in the video contradicts their assertions.

The video provided a less clear picture of Kepley's position relative to Beasley. In his affidavit, however, Kepley explains that he applied no pressure to Beasley's torso or chest; instead, he claims that Beasley "lay on his stomach" while Kepley "was on his left side laying on the floor." Kepley Aff. ¶ 9–10. On the video, Kepley's knees appeared to be in contact with the floor to the left of Beasley's body.

Less than two minutes after bringing Beasley to the ground, all the deputies with the exception of Anderson stood up and looked at Beasley from above.[9] Anderson remained kneeling next to Beasley while initially rolling him onto his side and, several seconds later, flat on his back.[10] Anderson then repeated this motion with the assistance of another officer.[11] Beasley was evidently unresponsive by this point, and Anderson began CPR.

---

[8] *Id.* at 6:55 – 8:00.
[9] Ex. K at 8:05.
[10] *Id.* at 8:05 – 8:20.
[11] *Id.* at 8:30 – 9:15.

4

Deputy Renée Brothers ("Brothers") placed leg shackles on Beasley. She then assisted Anderson and "radioed the control room to check on the status of the ambulance and sent Brown and [Deputy Thaddeus] Frye to check on its status at different times." Brothers Aff. ¶ 11. She "continued to assist Anderson with Beasley until members of the Petersburg Fire Department arrived. The Southside Virginia Emergency Crew arrived shortly thereafter." *Id.*; *see also* Anderson Aff. ¶ 13.

Multiple firefighters from the Petersburg Fire Department arrived on the scene in response to an emergency call from the jail. *See* Macaluso Aff. ¶¶ 1–2; Mann Aff. ¶¶ 1–3; Ivey Aff. ¶¶ 1–2. These firefighters are trained only in Basic Life Support and are "not authorized to utilize forceps to remove an obstruction that is not visible from examining the inside of a patient's mouth." Macaluso Aff. ¶ 7; Mann Aff. ¶ 8. As a result, though they could tell that an unknown obstruction blocked Beasley's airway, they could neither remove the object, nor could they insert an airway into the patient's mouth to facilitate breathing. Macaluso Aff. ¶ 6; Mann Aff. ¶ 7. All the same, the firefighters attempted both chest compressions and artificial respirations using a bag valve mask. Ivey Aff. ¶ 12–13.

According to both Anderson and Brothers, an Emergency Medical Technician ("EMT") from the ambulance squad ultimately retrieved "a plastic baggie containing a white substance from Beasley's throat using long, curved forceps." Brothers Aff. ¶ 12; Anderson Aff. ¶ 14. This EMT, Joe Grau, used a laryngoscope to check Beasley's airway and found a golf-ball-sized "baggie . . . laying over the patient's glottis opening (vocal cords)." Grau Aff. ¶ 5. He removed the baggie using forceps and intubated Beasley, at which point the firefighters resumed CPR. *Id.* ¶ 6. Grau explains that one must be a trained EMT both to use McGill forceps and to intubate a patient. *Id.* ¶ 7. He also says that he followed Advanced Cardiac Life Support (ACLS) protocols

5

when treating Beasley and accompanied him to Southside Regional Medical Center by ambulance. *Id.* ¶¶ 8–9. After receiving the plastic bag from Grau, Anderson returned it to the receiving area of the jail. Brothers Aff. ¶ 12; Anderson Aff. ¶ 14.

Defendant Wanda Henderson, a medic at the jail, had no physical contact with Beasley during the incident described above. Her only role was to "retrieve[ ] the necessary insurance information to provide to members of the emergency medical services." Henderson Aff. ¶¶ 1–4.

Beasley was declared deceased following his abortive attempt to escape. Dr. Deborah Kay, M.D., a pathologist in the Office of the Chief Medical Examiner in Richmond, Virginia, performed an autopsy on Beasley. Kay Aff. ¶¶ 1, 3. In her autopsy report, she concluded, "Postmortem examination revealed no significant medical diseases and no significant trauma that could cause or contribute to death. . . . This death is attributed to the aspiration of the plastic bag." *Id.*, Ex. A. at 3.

## II. Standard of Review

Summary judgment is appropriate when the movant establishes that there is no genuine dispute of any material fact and he is thereby entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). After an adequate period of time for discovery, Rule 56(a) mandates a grant of summary judgment against a party who fails to make a showing sufficient to establish the existence of an essential element of a claim or defense on which that party will bear the burden of proof at trial. Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 322. A court resolves all genuine factual disputes and inferences in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam).

Once the movant satisfies its showing for summary judgment, the burden shifts to the non-moving party to establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–88 (1986). The non-movant may not rest on claims within its pleading, but "must come forward with specific facts showing that there is a genuine issue for trial." *Id.* at 587 (internal quotation marks and emphasis omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."); *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 308 (4th Cir. 2006) ("Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law."). Of course, the Court cannot weigh the evidence or make credibility determinations in its summary judgment analysis. *Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004). Ultimately, the relevant inquiry in a summary judgment analysis is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52 (1986).

### III. Discussion

*A. The Plaintiff Cannot Prove a Violation of Beasley's Constitutional Rights*

"In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394 (1989). As a pretrial detainee, Beasley enjoyed the protections of the Fourteenth Amendment. *Orem v. Rephann*, 523 F.3d 442, 446 (4th Cir. 2008) ("[E]xcessive force claims of a pretrial detainee [or arrestee] are governed by the Due

Process Clause of the Fourteenth Amendment.") (quoting *Taylor v. McDuffie*, 155 F.3d 479, 483 (4th Cir. 1998), *overruled in part by Wilkins v. Gaddy*, 130 S. Ct. 1175, 1179–80 (2010) (per curiam)). In order to succeed on an excessive force claim under the Due Process Clause of the Fourteenth Amendment,[12] the plaintiff must show that the defendants "inflicted unnecessary and wanton pain and suffering" on Beasley. *Id.* (quoting *Taylor*, 155 F.3d at 483); *see also Whitley v. Albers*, 475 U.S. 312, 320 (1986).

The Court must consider a specific set of factors in assessing whether the plaintiff has met her burden: "the need for the application of force, the relationship between the need and the amount of force used, the extent of the injury inflicted, and whether the force was applied in a good faith effort to maintain and restore discipline or maliciously and sadistically for the very purpose of causing harm." *Id.* (citing *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973).

In the instant case, each one of the due process factors favors the defendants. First, the defendants clearly faced a situation in which some amount of force was essential to subdue Beasley, who refused to comply with their directions, fled the scene of a legitimately initiated search, and attempted to destroy, or at least secrete, the evidence of his offenses (*i.e.*, the hidden plastic bag of drugs). A contrary conclusion would leave pretrial detainees free to do as they please, even when valuable evidence is at stake, and even when their actions could place themselves, other detainees, and law enforcement officers at risk of injury. The Fourth Circuit has explicitly stated, in fact, that officers possess the discretion to respond with force under such circumstances. *Scarbro v. New Hanover Cnty.*, 374 Fed.Appx. 366, 370, 2010 WL 1252409, at *2 (4th Cir. Apr. 1, 2010) ("Moreover, we must accord due deference to an officer's efforts to restrain a detainee when faced with a dynamic and potentially violent situation; otherwise, 'we

---

[12] "No State shall . . . deprive any person of life, liberty, or property, without due process of law. . . ." U.S. CONST. amend. XIV, § 1.

8

would give encouragement to insubordination in an environment which is already volatile enough.'") (quoting *Grayson v. Peed*, 195 F.3d 692, 697 (4th Cir. 1999)).

Second, one cannot say, based on the video footage before the Court, that the defendants employed a degree of force disproportionate to the seriousness of the situation. The plaintiff argues that it is "possible" that the deputies applied too much weight to Beasley's torso, but she offers no evidence showing that this mere possibility is anything more than unsubstantiated speculation. Consequently, the plaintiff simply cannot bridge the gap from mere possibility to likelihood, which is the required showing for any tort claim, whether it falls under § 1983 or the common law.

As to the extent of the injury, the Court must focus only on the harm that is fairly traceable to the defendants' own actions. That is to say, because the evidence before the Court supports the conclusion that Beasley died from aspirating the plastic bag, and not the defendants' use of force, Kay Aff., Ex. A. at 3, the relevant "injury" is not Beasley's death, however unfortunate it may be.[13] A careful consideration of the evidence suggests, in fact, that the defendants inflicted *no* measurable injury during the altercation. As the medical examiner's report stated, "Postmortem examination revealed . . . no significant trauma that could cause or contribute to death." *Id.* And, other than Beasley's untimely death, the plaintiff identifies no harm that Beasley suffered during the incident—broken bones, bruises, cuts, or scrapes—to bolster her argument. As *Wilkins v. Gaddy* teaches, the "absence" of injury does not necessarily foreclose an excessive force claim, but it does "provide some indication of the amount of force applied" and also "suggest whether the use of force could plausibly have been thought

---

[13] The need for *proximate* causation requires little explanation. If Beasley's death was evidently due to independent forces, and not the defendants' actions, one can hold the defendants liable for this "injury" no more than if Beasley had darted out the jailhouse door and been struck by an oncoming bus.

9

necessary" under the circumstances. *Wilkins*, 130 S. Ct. at 1178 (citations omitted). One can hardly fault the defendants for pursuing Beasley, apprehending him, and bringing him to the ground in order to prevent him from fleeing and destroying evidence, especially when the record does not show that Beasley suffered any injury as a direct result of the defendants' actions.

Based on the evidence before the Court, one simply cannot conclude that the defendants applied force "maliciously and sadistically for the very purpose of causing harm" to Beasley. *Orem*, 523 F.3d at 446 (quoting *Johnson*, 481 F.2d at 1033). Though one can speculate about dozens of possibilities, the evidence shows that the defendants used force "in a good faith effort to maintain and restore discipline," to stop the decedent's flight, and to prevent the loss of important evidence. *Id.* Accordingly, the plaintiff cannot establish that any of the defendants violated Beasley's due process rights, and the Court must grant the defendants summary judgment on the plaintiff's § 1983 claim.

### B. Principles of Qualified Immunity

Qualified immunity protects government officials from liability in § 1983 actions arising from the performance of discretionary actions. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It applies so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* To put it even more plainly, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

The analysis of a qualified immunity claim entails two steps, though the order in which a court performs this analysis is flexible.[14] In the first step, a court must decide "whether a

---

[14] Where it is clear that the right was not clearly established at the time of the conduct, the Court need not undertake the academic task of determining whether the right exists and has been violated. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("On reconsidering the procedure

constitutional right would have been violated on the facts alleged." *Saucier v. Katz*, 533 U.S. 194, 200 (2001); *Bailey v. Kennedy*, 349 F.3d 731, 739 (4th Cir. 2003). This includes an analysis, based on the evidence, of the specific right allegedly violated, and a conclusion that such a right exists in the particular circumstances of the case. *Wilson v. Layne*, 526 U.S. 603, 609 (1999). Second, a court must determine whether, at the time of the violation, the right was clearly established such that a reasonable officer in the defendant's position would know that his actions would violate that right. *Simmons v. Poe*, 47 F.3d 1370, 1385 (4th Cir. 1995).

At the time of the officer's actions, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "[A]lthough the exact conduct at issue need not have been held to be unlawful in order for the law governing an officer's actions to be clearly established, the existing authority must be such that the unlawfulness of the conduct is manifest." *Wilson*, 141 F.3d at 114.

"The difficult part of this inquiry is identifying the level of generality at which the constitutional right must be clearly established." *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007). The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality. The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *Ashcroft v. al-Kidd*,

---

required in *Saucier*, we conclude that, while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."); *Walker v. Prince George's Cnty.*, 575 F.3d 426, 429 (4th Cir. 2009).

11

131 S. Ct. 2074, 2084 (2011). One can certainly say the same for the Due Process Clause's protection against excessive force.

As the Fourth Circuit has said, qualified immunity exists so that "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). Stated differently, the doctrine affords officers "additional breathing room" for decisions made on the spot. *Merchant v. Fairfax Cnty.*, 778 F. Supp. 2d 636, 647 (E.D. Va. 2011). "Because '[law enforcement] officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving,' the facts must be evaluated from the perspective of a reasonable officer at the scene, and the use of hindsight must be avoided." *Waterman v. Batton*, 393 F.3d 471, 476–77 (4th Cir. 2005) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)) (internal citations omitted). Qualified immunity hence "gives ample room for mistaken judgments." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

### C. The Defendants Enjoy the Protection of Qualified Immunity

Because the plaintiff cannot show that the defendants' use of force was excessive under the circumstances, she necessarily fails on the first prong: whether a constitutional right was violated based on the particular facts of the case. *See Saucier*, 533 U.S. at 200. The Court must emphasize that this case presents no disputed issues of material fact. The plaintiff counters actual evidence of what did happen with mere speculation about what might have happened.

Moreover, even if the plaintiff could raise a triable issue of fact, "[t]he existence of disputed material facts—which must be submitted to a jury—does not alter the 'essentially legal' nature of the question of whether the right at issue was clearly established." *Willingham v. Crooke*, 412 F.3d 553, 559 (4th Cir. 2005) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526

(1985)). Accepting for a moment the plaintiff's speculation that some sort of scrum occurred, the Court holds that reasonable officers in the defendants' respective positions would not have known that their actions violated Beasley's right to be free of excessive force. The plaintiff fails to present any "controlling precedent" in the form of "closely analogous cases" or "a clear trend in the case law" from which the defendants could have learned that their actions would violate Beasley's rights. *Estate of Escobedo v. Bender*, 600 F.3d 770, 781 (7th Cir. 2010) (citations omitted).

Second, even assuming a set of facts charitable to the plaintiff, the Court simply cannot say that the defendants' actions fell outside qualified immunity's "ample room for mistaken judgments" or that they were "plainly incompetent" under the circumstances. *Malley*, 475 U.S. at 341. Without belaboring the details, the evidence shows, at worst, that the defendants gang-tackled Beasley when he was fleeing with a bag of drugs. The deputies' actions were precipitated entirely by Beasley's persistent effort to elude their grasp and prevent them from obtaining the evidence of his crime. As the Fourth Circuit has emphasized time and again, courts "must accord due deference to an officer's efforts to restrain a detainee when faced with a dynamic and potentially violent situation; otherwise, 'we would give encouragement to insubordination in an environment which is already volatile enough.'" *See Scarbro*, 374 Fed.Appx. 366, 370, 2010 WL 1252409, at *2 (quoting *Grayson*, 195 F.3d at 697). For these reasons, qualified immunity applies to the defendants' conduct, thus reinforcing the Court's grant of summary judgment to the defendants on the plaintiff's § 1983 claim.[15]

---

[15] In her response in opposition to the motion for summary judgment, the plaintiff improperly raises novel theories to support her § 1983 claim. First, she argues that the defendants exhibited "deliberate indifference" to Beasley's injuries by failing to diligently address his unresponsive condition. Second, she argues that the defendants already knew or believed Beasley to have an obstructed airway when they apprehended him and "pil[ed] on top of him." *See* Pl.'s Mem. Opp.

### D. *The Plaintiff's State Law Claims Fail*

The plaintiff has brought a "common law claim for wrongful death" against the defendants, but no such cause of action exists in Virginia.[16] Even if the plaintiff had brought this claim pursuant to Virginia's wrongful death statute, the claim would still lack merit. The Commonwealth's wrongful death statute does not provide a *cause* of action but, rather, a *right* of action to the deceased victim's estate, guardian, or personal representative. Va. Code § 8.01-50. A wrongful death claim is a procedural vehicle for these third parties to assert a claim that, had the victim survived, would belong to the victim. Here, since the plaintiff cannot prove any wrongdoing by the defendants against Beasley—let alone "malicious, intentional, and reckless acts," as the plaintiff alleges—her wrongful death claim fails.[17] Compl. ¶ 66.

The plaintiff's common law conspiracy claim similarly fails. The plaintiff alleges that certain "defendants each *agreed* to pile on [Beasley] and cause him to be harmed," while others "idly stood by as they witnessed the other Defendants applying excessive force against him." Compl. ¶¶ 70, 72 (emphasis added). Consequently, she argues, the defendants "jointly and in concert, unlawfully used excessive force to detain" him and "accomplished, through their

---

Defs.' Mot. Summ J., ¶ 16; Ex. B at 1–2. The problems with this approach are at least two-fold. For one, if the plaintiff wants to add new claims, she must seek leave to amend her complaint—not slip them into an opposition brief. More importantly, as with her existing § 1983 claim, neither one of these new theories finds any support in the record. If anything, upon realizing that Beasley was not moving and may have had something lodged in his throat, the defendants, along with others, undertook significant efforts to revive him. Consequently, the plaintiff cannot prove that the defendants acted with deliberate indifference to Beasley's serious medical needs. *See Scarbro*, 374 Fed.Appx. 366, 370–71, 2010 WL 1252409, at *3–4 (citing *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)).

[16] The plaintiff does not respond to the defendants' motion for summary judgment on this claim.

[17] Insofar as the plaintiff has sued the defendants for simple negligence, sovereign immunity bars the claim entirely. *Colby v. Boyden*, 241 Va. 125, 130 (1991) ("Under Virginia law, where, as here, a defendant's actions are clothed with sovereign immunity, a plaintiff must establish gross negligence in order to prevail.").

concerted action, detention of [Beasley] through unlawful means." Id. ¶¶ 68–69. The record offers no support for these allegations. Because no proof exists that "two or more [defendants] combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means," the conspiracy claim may not go forward. *Commercial Business Sys., Inc. v. Bellsouth Servs., Inc.*, 249 Va. 39, 48 (1995) (citing *Hechler Chevrolet v. General Motors Corp.*, 230 Va. 396, 402 (1985)). The Court accordingly grants summary judgment to the defendants on the plaintiff's state law claims as well.

*E. The Plaintiff's Punitive Damages Claims Fail*

Since all the plaintiff's claims fail, no basis exists to award punitive damages. The Court therefore grants summary judgment to the defendants on the plaintiff's two separate claims for punitive damages.

## IV. Conclusion

For the reasons stated above, the Court grants the defendants' motion for summary judgment on all counts.

Let the Clerk send a copy of this Memorandum Opinion to all counsel of record.

An appropriate Order shall issue.

Date: March 27, 2013
Richmond, VA

/s/ John A. Gibney, Jr.
United States District Judge